**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KEVIN ZIMMERMAN,

        Plaintiff,

vs.

GJS GROUP, INC.,

        Defendant.

Case No. 2:17-cv-00304-GMN-GWF

**ORDER**

**Re: State of Nevada's Motion to Intervene as a Limited Purpose Defendant (ECF No. 28).**

This matter is before the Court on the State of Nevada's ("State") Motion to Intervene as a Limited Purpose Defendant (ECF No. 28), filed on August 8, 2017. Plaintiff filed his Response (ECF No. 31) on August 22, 2017 and the State filed its Reply (ECF No. 32) on August 29, 2017. The Court conducted a hearing in this matter on September 5, 2017.

## **BACKGROUND**

Plaintiff Kevin Zimmerman filed the complaint in this action on March 23, 2017. *Complaint* (ECF No. 18). It was served on Defendant GJS Group, Inc. ("GJS") on April 11, 2017. *See Declaration of Service* (ECF No. 26). GJS has not answered or otherwise responded to complaint. Plaintiff has not moved for the entry of GJS's default.

Plaintiff alleges a claim for injunctive relief, attorney's fees and costs pursuant to the Americans with Disabilities Act, 42 U.S.C. § 121010 *et. seq.*, (hereinafter "ADA" or "Act"). He alleges that GJS operates a Place of Public Accommodation ("PPA") located at 8080 S. Las Vegas Blvd, Las Vegas, Nevada 89123. Although not identified as such, this address corresponds to a 7- Eleven convenience store at that location. Plaintiff alleges that on the date of his visit to Defendant's store, he was a resident of Nevada who travels throughout the state, including communities in and surrounding Las Vegas.

Plaintiff is an individual with disabilities and his health and mobility are dependent on the use of a wheelchair. Plaintiff alleges that he is a customer of Defendant and personally visited Defendant's store on December 30, 2016, "but was denied full and equal access and full and equal enjoyment of the facilities, goods and amenities." *Complaint* (ECF No. 18), ¶¶ 8-9. Plaintiff alleges that he will avail himself of the goods and services offered at the PPA in the future provided that Defendant modifies the PPA to accommodate individuals with disabilities. *Id.* at ¶ 10. Plaintiff also alleges that he has acted as a tester for purposes of discovering, encountering, and engaging discrimination against persons with disabilities at Defendant's PPA. He intends to visit the PPA regularly to verify compliance or noncompliance with the ADA. *Id.* at ¶ 11. He also intends to visit Defendant's PPA several more times per year in the near future, but is deterred from doing so while Defendant's PPA violates the ADA. *Id.* at ¶ 13. Plaintiff alleges that he encountered the following violations of the ADA at Defendant's store on December 30, 2016: (a) failure to provide the clear width of walking surfaces in aisles and pathways no less than 36 inches (915 mm) as required by 36 CFR Part 1191, Appendix D, Guideline 403.5.1; and (b) failure to provide signs containing the designation "van accessible" that identify van parking spaces as required by 36 CFR Part 1191, Appendix D, Guideline 502.6. *Id.* at ¶ 29.

Between January 31 and May 20, 2017, Mr. Zimmerman filed 274 actions in the District of Nevada alleging similar violations of the ADA against various defendants. The complaints contain the same general allegations. Each alleges that Plaintiff visited defendants' PPAs on at least one occasion prior to filing the lawsuit during which he observed violations of the ADA which limited his access. To date, Plaintiff has settled or dismissed 184 of the cases, with a stipulation and order for dismissal currently pending in one additional case. Defaults have been entered in 9 cases, but Plaintiff has not sought a default judgment in those cases.

Defendants have filed motions to dismiss or for judgment on the pleadings in the following cases which are currently pending before the Court: (1) <u>Zimmerman v. Siavash</u>, Case No. 2:17-cv-560-GMN-GWF, Motion for Judgment on the Pleadings (ECF No. 21), filed June 29, 2017; (2) <u>Zimmerman v. Snowed Inn, LLC</u>, Case No. 2:17-cv-563-GMN-GWF, Motion to Dismiss or in the Alternative Motion for More Definite Statement (ECF No. 18), filed September 21, 2017; (3) <u>Zimmerman v. Snowed Inn, LLC</u>, Case No. 2:17-cv-595-GMN-GWF, Motion to Dismiss or in the Alternative Motion for More

Definite Statement (ECF No. 21), filed June 28, 2017; (4) <u>Zimmerman v. Snowed Inn, LLC</u>, Case No. 2:17-cv-1198-GMN-GWF, Motion to Dismiss or in the Alternative Motion for More Definite Statement (ECF No. 11), filed September 21, 2017; (5) <u>Zimmerman v. Trader Joe's Company</u>, Case No. 2:17-cv-1203-GMN-GWF, Motion to Dismiss or in the Alternative Motion for More Definite Statement (ECF No. 7), filed May 18, 2017; (6) <u>Zimmerman v. Rose Group Holdings, Inc. DBA 7-Eleven Food Store 29660 C</u>, Case No. 2:17-cv-1315-GMN-GWF, Motion to Dismiss (ECF No. 10), filed August 10, 2017; (7) <u>Zimmerman v. WBF McDonalds Managementt, LLC d/b/a McDonalds</u>, Case No. 2:17-cv-1358-GMN-GWF, Motion to Dismiss or in the Alternative Motion for More Definite Statement (ECF No. 10), filed July 3, 2017; and (8) <u>Zimmerman v. WBF McDonalds Managementt, LLC d/b/a McDonalds</u>, Case No. 2:17-cv-1359-GMN-GWF, Motion to Dismiss or in the Alternative Motion for More Definite Statement (ECF No. 8), filed July 13, 2017.[1] The same law firm represents the defendants in cases (2), (3), (4), (7) and (8) and has filed substantially the same motion in all five cases.

The State represents that it has found several instances where Plaintiff alleges that he encountered violations of the ADA at four or five businesses on the same date. *Motion* (ECF No. 28), pg. 4, n. 4. According to the example provided by the State, the businesses were located in roughly the same vicinity on Eastern Avenue in Henderson, Nevada. *Id*. The State also represents that Plaintiff filed all 274 lawsuits without providing prior notification of the alleged ADA violations to the defendants, and affording them the opportunity to investigate and rectify the alleged violations without litigation. *See Transcript of Motion Hearing* (ECF No. 34), pg. 4:16-23. The State argues that Plaintiff and his backers have pursued this strategy in order to extract monetary settlements from the defendants who otherwise will incur significantly greater legal expense to defend the actions. The State cites a newspaper article stating that "dozens of Nevada business owners have pursued settlement at a cost ranging from $3,900 to $7,500 per case . . . ." *Motion* (ECF No. 28), pg. 5.

Plaintiff's counsel confirmed that the defendants were not given notice of and an opportunity to correct the alleged ADA violations before they were sued. *Transcript of Motion Hearing* (ECF No. 34),

---

[1] A motion to dismiss was also filed in <u>Zimmerman v. 99 Cents Only Stores, LLC</u>, 2:17-cv-395-GMN-GWF on April 27, 2017. Plaintiff filed a notice of settlement in that case on July 13, 2017 and a Notice of Voluntary Dismissal (ECF No. 28) was filed on August 1, 2017.

pg. 16:1-22. Plaintiff's counsel stated that none of the cases have settled for more than $3,900. He estimated that the average settlement is around $2,000. *Id.* at pg. 24:7-9. The settlement payments are for the attorney's fees and costs of litigation. Plaintiff's counsel also stated that after complaints are served, the defendants are given "as much time as they need to do inspections, respond to us, take pictures if they respectfully disagree." *Id.* at pg. 17:7-9. Some cases have been dismissed when the financial burden on a business was too great, and Plaintiff has reduced the amount of some settlement demands for the same reason. *Id.* at pg. 17:10-13. Plaintiff's counsel further represented: "What we get in these cases is a settlement agreement where the violations are memorialized, where the party then responds to us, giving us proof of compliance where they have made – they've repaired the violations." *Id.* at pg. 17:16-20.

The Court previously conducted a hearing with Mr. Zimmerman and Plaintiff's counsel on March 3, 2017. Plaintiff's counsel provided the Court with a copy of the written agreement between Mr. Zimmerman and Litigation Management and Financial Services, LLC which funds and controls the litigation filed on Plaintiff's behalf. According to this agreement, Mr. Zimmerman receives $50.00 for each ADA claim that results in a filed complaint initiating a civil action. Mr. Zimmerman informed the Court that he does not receive any additional payments for his participation in these actions. *Transcript of March 3, 2017 Motion Hearing* (ECF No. 27), pg. 9. It does not appear that Mr. Zimmerman exercises decision-making authority in these cases. Settlement decisions are presumably made by Litigation Management and Financial Services, LLC in conjunction with Plaintiff's counsel.

The State asserts that it is entitled to intervene in these actions as a matter of right, or, in the alternative, that permissive intervention should be granted. It argues that Plaintiff's "complaints are potentially malicious or, at best, premature and poorly drafted; failing to state a cause of action or adequately establish the plaintiff's standing to bring these suits." *Motion* (ECF No. 28), pg. 2. The State claims that it has a strong interest in protecting the public from malicious or premature lawsuits that threaten Nevada business owners and adversely impact Nevada's general economy. *Id.* The State also argues that the Nevada Equal Rights Commission ("NERC") was entitled to notice from Plaintiff of the alleged ADA violations before he filed his actions so that the Commission could "have the first opportunity to address noncompliant PPAs within their borders . . . ." *Id.* at pgs 2-3. If its motion to

4

intervene is granted, the State intends to move for consolidation and dismissal of Plaintiff's remaining ADA actions. *Id.* at pg. 3.

### DISCUSSION

**A.  Intervention of Right.**

Rule 24(a) of the Federal Rules of Civil Procedure provides that on timely motion, the court must permit anyone to intervene who (1) is given an unconditional right to intervene by a federal statute, or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.  Motions for intervention as a matter of right are governed by a four-part test: (1) the application for intervention must be timely; (2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.  *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001) (citing *Northwest Forest Resource Council ("NFRC") v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)).

**1.  Timeliness.**

Timeliness is a flexible concept and its determination is left to the court's discretion.  *United States v. Alisal Water Corp. ("Alisal")*, 370 F.3d 915, 921 (9th Cir. 2004) (citing *Dilks v. Aloha Airlines*, 642 F.2d 1155, 1156 (9th Cir. 1981)).  Three factors are weighed in determining whether a motion to intervene is timely: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reasons for and length of the delay.  *Id.* (citing *Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir. 2002)).  Although delay can strongly weigh against intervention, the mere lapse of time, without more, is not necessarily a bar to intervention.  *Id.* (citing *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984)).

Mr. Zimmerman's lawsuits were filed between January and June of this year.  The State of Nevada's interest in property or in a particular transaction was not directly affected by these lawsuits such that it would have had early notice of them.  One of the State's arguments is that Plaintiff had a

duty to notify NERC of the alleged ADA violations before he filed suit.  Although Plaintiff was not required to provide pre-suit notice to NERC, the absence of early notice of the lawsuits weighs somewhat in the State's favor on the issue of timeliness.[2]  There is no indication that the State seeks to unwind any settlement agreement that has already been entered into.  The cases that remain pending are, for the most part, still in the discovery stage.  If allowed to intervene, the State intends to attack these actions on the grounds that Mr. Zimmerman lacks standing and that his claims are frivolous or brought with an improper motive.  Although these arguments should be raised as early as possible, the State's alleged delay will not result in intervention occurring at a belated stage in the litigation.  Nor is the alleged delay due to lack of diligence by the State.

Prejudice has been found where intervention would inject new issues into the lawsuit or would disrupt ongoing settlement negotiations.  *Alisal*, 370 F.3d at 922 (citing *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978) and *Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d at 1119).  The issues relating to Plaintiff's standing or the improper purpose in bringing these lawsuits have already been raised by a few defendants.  These issues have also been raised in other districts where individuals or entities have filed multiple ADA lawsuits and pursued similar settlement strategies.  *See Carton v. Carroll Ventures, Inc.*, 2017 U.S. Dist. LEXIS 107135 (D.N.M. July 10, 2017); *Advocates for Individuals with Disabilities v. WSA Properties, LLC*, 210 F.Supp.3d 1213 (D.Ariz. 2016).  The State's intervention may cause some defendants to defer settlement negotiations to see if the State is successful in obtaining dismissal of the remaining actions.  Plaintiff has not demonstrated, however, that the State's motion has interfered with any ongoing settlement negotiations.  Lack of timeliness, therefore, is not a valid reason to deny the State's motion to intervene.

        **2.**        **Whether the State is Required to Establish Article III Standing.**

Plaintiff relies on *Town of Chester, N.Y. v. Laroe Estates, Inc.*, ___ U.S.___, 137 S.Ct. 1645 (2017) to argue that the State must establish that it has standing under the case or controversy requirement of Article III, Section 2, Clause 1 of the United States Constitution.  Pursuant to Article III,

---

[2] The impetus for the State's motion may have come from a July 12, 2017 newspaper column discussing and criticizing Mr. Zimmerman's lawsuits.  *Motion* (ECF No. 28), pg. 5, n. 6.

a plaintiff seeking compensatory relief must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* at 1650. The plaintiff must demonstrate standing for each form of relief sought. The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint. *Id.* at 1650-51. The same principle also applies to intervenors of right. For all relief sought, there must be a litigant with standing. An intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests. Plaintiff argues that the State must establish Article III standing because it seeks relief different from that which *Plaintiff* seeks. The State, however, seeks to intervene on the side of the *Defendants* for the purpose of moving for the dismissal of these actions. The comparison between Plaintiff's claims and what the State seeks is therefore inapt. Whether the State has standing to intervene on the side of the Defendants should be analyzed under the doctrine of *parens patriae* and the factors regarding intervention under Rule 24(a).

**3. Whether the State has *parens patriae* standing, or a "significant protectable interest" which only it can represent in these cases.**

The doctrine of *parens patriae* derives from the common law principle that a sovereign, as "parent of the country," may step in on behalf of its citizens to prevent "injury to those who cannot protect themselves." *Alfred L. Snapp, Etc. v. Puerto Rico, ex rel., Barez*, (*Snapp*) 458 U.S. 592, 600, 102 S.Ct. 3260, 3265 (1982); *Connecticut v. Physicians Health Services of CT*, 287 F.3d 110, 119 (2d Cir. 2002). To bring an action or to intervene in an action on the basis of this doctrine, the State must satisfy its "the unique requirements." First, the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. Second, the State must express a quasi-sovereign interest. *Missouri ex rel. Koster v. Harris* (*Koster*), 847 F.3d 646, 651 (9th Cir. 2017). *Koster* noted that "[o]ther courts have recognized that *parens patriae* standing is inappropriate where an aggrieved party could seek private relief. The Second Circuit, for example, held that "*[p]arens patriae* standing . . . requires a finding that individuals could not obtain complete relief through a private suit." *Id.* at 652 (quoting *N.Y. ex rel. Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982) *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc))." The requirements

for *parens patriae* standing are substantially similar to the second, third and fourth factors used in determining intervention by right under Rule 24(a).

In *Koster*, several states challenged a California statute that governs the conditions in which egg-laying hens are kept and which prohibits farmers who do not comply with the statute's requirements from selling eggs in California. In holding that the plaintiff-states did not satisfy the first requirement for *parens patriae* standing, the court stated that "complete relief would be available to the egg farmers themselves were they to file a complaint on their own behalf." *Id.* at 652. The court distinguished cases in which substantial numbers of a plaintiff-state's residents are affected by another state's or private party's actions, such as cases involving the regulation of utilities. *Id.* at 652-53. Because the plaintiffs did not satisfy the first requirement of the *parens patriae* doctrine, the court did not reach the second requirement.

"A 'quasi-sovereign interest' . . . is a judicial construct that does not lend itself to a simple or exact definition. Its nature is perhaps best understood by comparing it to other kinds of interests that a State may pursue and then by examining those interests that have historically been found to fall within this category." *Snapp*, 458 U.S. at 601, 102 S.Ct. at 3265. A quasi-sovereign interest "consists of a set of interests that the State has in the well-being of its populace. Formulated so broadly, the concept risks being too vague to survive the standing requirement of Article III: A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant. The vagueness of this concept can only be filled by turning to individual cases." *Id.* at 602, 102 S.Ct. at 3266. "Although the articulation of such an interest is a matter of case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract—certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607, 102 S.Ct. at 3268-69. The Court held that Puerto Rico had a quasi-sovereign interest in protecting its residents who sought work as temporary farm workers in the United States and who were entitled to preference in hiring over foreign workers. Although only a limited number of Puerto Rico residents were directly affected by the

defendants' conduct, the Court held that Puerto Rico had a sufficient quasi-sovereign interest to challenge the practice based on its potential impact on substantial numbers of its residents.

Federal courts have recognized that states may have *parens patriae* standing to enforce federal civil rights and anti-discrimination laws on behalf of their residents. In *People by Vacco v. Mid Hudson Medical Group, P.C. ("Vacco")*, 877 F.Supp. 143, 144 (S.D.N.Y. 1995), the court held that New York had standing to bring an action under Article III of the ADA to redress the defendant's failure to provide sign language interpreters for deaf patients at medical examinations. The court cited *New York v. 11 Cornwell Co.*, 695 F.2d 34 (2d Cir. 1982) which held that the state had *parens patriae* standing to sue under 42 U.S.C. § 1985 on behalf of mentally disabled individuals who were being discriminated against in housing; and *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981), which held that the state had *parens patriae* standing to sue on behalf of victims of police misconduct under 42 U.S.C. § 1983. *Id.* at 146. The court in *Vacco* stated that the state was more than a nominal party because it was seeking relief for "all hearing impaired New Yorkers" and not just for the individual who had allegedly been discriminated against by the defendant. The court also found that the State had a quasi-sovereign interest in the nondiscriminatory treatment of its residents, as evidenced by the state's enactment of its own anti-discrimination statutes. *Id.* at 147. The court noted that "the raw number of individuals directly involved does not determine whether the State has 'alleged injury to a sufficiently substantial segment of its population.' (citation omitted). *Snapp* held that the 'indirect effects of the injury must be considered' in making this determination." *Id.* at 148.

The State of Nevada argues that it has a strong interest in ensuring that the public interest is represented in the ADA cases filed by Mr. Zimmerman. It also asserts that the Nevada Consumer's Advocate, whom it seeks to include as a named defendant, "has broad discretion to participate in any proceeding involving the public interest[.]" *Motion* (ECF No. 28), pg. 8. In support of this assertion, the State cites Nevada Revised Statute (NRS) § 228.308 which defines the "public interest." *Id.* at n. 14. NRS 228.380.1 states that "the Consumer's Advocate may exercise the power of the Attorney General in areas of consumer protection, including but not limited to chapters 90, 597, 598, 598A, 598B, 598C,

599B and 711 of the NRS."[3]  It therefore appears that the Consumer's Advocate has the authority to intervene in an action to protect the public interest so long as the requirements of *parens patriae* standing and intervention of right are met.

The State also argues that it has a direct and separate interest to vindicate in these actions because the Plaintiff has circumvented 42 U.S.C. § 12188(a)(1) which incorporates the remedies and procedures of 42 U.S.C. § 2000a-3(c).  Section 2000a-3(c) "requires the plaintiff to first give notice to the relevant State authority and then wait 30 days before filing suit in Federal Court." *Motion* (ECF No. 28), pg. 9.  The State therefore argues that Plaintiff was required to notify the Nevada Equal Rights Commission (NERC) of the alleged ADA violations before he filed these lawsuits.  The Ninth Circuit, however, rejected the State's interpretation of 42 U.S.C. § 12188(a)(1) in *Botosan v. Paul McNally Realty*, 216 F.3d 827 (9th Cir. 2000), wherein it stated:

> The plain language of § 12188(a)(1) is clear and unambiguous, and it can be understood without reference to any other statutory provision.  Section 12188(a)(1) is devoid of any reference to § 2000a-3(c).  Yet, Congress explicitly incorporated subsection (a) of § 2000a-3 into § 12188(a)(1).  The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius*.  Surely, "Congress obviously knew how to adopt provisions of Title VII because it expressly adopted subsection (a) . . . [and it is] unlikely that Congress would absentmindedly forget to adopt a provision that appears a mere two paragraphs below the subsection it adopted." *Botosan*, 13 F.Supp.2d at 1050; *see also Guzman*, 40 F.Supp.2d 930.  Even if incorporation of all subsections of § 2000a-3 into § 12188(a)(1) did not render the explicit reference to § 2000a-3(a) superfluous or redundant, the statute's legislative history, the Code of Federal Regulations, *see* 28 C.F.R. § 26.501(a), and the Department of Justice's Technical Assistance Manual generally support the conclusion that Title III actions do not require state notification.  Thus, we hold that § 12188(a)(1) does not implicitly incorporate § 2000a-3(c).  A plaintiff in a private Title III action is not required to provide notice to any state or local agency as a prerequisite to filing suit.

216 F.3d at 832.

The State did not mention *Botosan* in its motion.  It attempts to distinguish *Botosan* in its reply brief by arguing that it "must be parsed in light of the facts then present." *Reply* (ECF No. 32), pgs 7-8.

---

[3] These chapters respectively govern securities, trade regulations and practices, deceptive and unfair trade practices, equal opportunity for credit, consumer reporting, telephone solicitation and utilities regulation.

Based on the clear holding in *Botosan*, there is nothing to parse. The State's argument that it is entitled to intervene to protect the NERC's right to pre-suit notice of the alleged ADA violations is without merit.

As discussed above, states may have *parens patriae* standing to enforce anti-discrimination or civil rights statutes where the defendant's alleged conduct directly or indirectly affects a significant segment of the state's population. Such standing is consistent with the doctrine's rationale—to prevent injury to those who cannot protect themselves. Arguably, a state also has standing to protect the interests of its residents and resident businesses when they are subjected to a systematic abuse of federal anti-discrimination laws. The State has raised a legitimate issue whether Plaintiff has standing under the ADA to pursue these actions. Plaintiff filed 274 Title III ADA lawsuits against Nevada businesses within in a six month time period. In each case, Plaintiff alleges that he "will avail himself of the goods and services offered at the PPA in the future provided the Defendant modify the PPA to accommodate individuals with disabilities." *Complaint* (ECF No. 18), at ¶ 10. He also alleges that in his role as a tester, he intends to visit the PPA regularly to verify compliance or noncompliance with the ADA. *Id.* at ¶ 11.

Courts are required to take a broad view of standing in civil rights actions, "especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008). There, the court cautioned that the attempted use of past litigation to prevent a litigant from pursuing ADA claims should be carefully scrutinized because most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled, and that it may indeed be necessary and desirable for committed individuals to bring serial litigation to advance the goals of the ADA. *Id.* at 1040 (citing *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007) (citing Samuel R. Bagnestos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation,*, 54 U.C.L.A. L.Rev. 1, 5 (2006)). *See also Antoninetti v. Chipolte Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010).

Courts, however, have found a plaintiff's allegations of an intent to return implausible where he has filed an extraordinary number of ADA actions, and other evidence casts doubt on the credibility of

his purported intention. In *Harris v. Stonecrest Care Auto Center, LLC*, 472 F.Supp.2d 1208, 1213 (S.D.Cal. 2007), the court stated that the plaintiff had sued so many different establishments that it was impossible to believe he routinely revisited the same establishments. *Harris* cited *Wilson v. Costco Wholesale Corp.*, 426 F.Supp.2d 1115, 1123 (S.D.Cal. 2006) (expressing concerns that plaintiff's declaration of intent to return to each of the 80 establishments he had sued was implausible); *Molski v. Mandarin Touch Restaurant*, 385 F.Supp.2d 1042, 1046 (C.D.Cal. 2005) (*Mandarin Touch II*) (finding that the plaintiff's extensive litigation history undercut his credibility and belied an intent to return sufficient to establish standing); and *Steven Brother v. Tiger Partner, LLC*, 333 F.Supp.2d 1368, 1374-75) (M.D.Fla. 2004) (finding implausible plaintiff's professed intent to return to all fifty-four establishments he had sued). *Harris* also discussed the characteristics of abusive ADA litigation which essentially involves a single plaintiff filing numerous ADA compliance lawsuits against businesses who are compelled to make modest monetary settlement payments to the plaintiffs or their attorneys, and where the plaintiffs and their attorneys do not actually seek to rectify violations of the ADA. *Id.* at 1215.

    *Harris* listed the following factors to be considered in determining the credibility of a plaintiff's assertion of an intent to return: (1) the proximity of the place of public accommodation to plaintiff's place of residence, (2) plaintiff's past patronage of defendant's business, (3) the definiteness of plaintiff's plans to return, and (4) plaintiff's frequence of travel near the business in question. *Id.* at 1216. The voluminous number of lawsuits filed by the plaintiff is also a significant factor in determining intent to return and standing to sue. *Id.* at 1217. The number of lawsuits filed by Plaintiff Zimmerman in such a short time frame seriously calls into question the credibility of his allegations that he intends to return to these business, and whether his actions are legitimately directing at obtaining compliance with the ADA. The issue of his standing to pursue these actions will require evaluation of the other factors listed in *Harris*.

    The most significant issue regarding the State's standing and the right to intervene is whether the relief it seeks can be fully achieved by the private defendants in these actions. Many of the defendants are substantial national, regional or local corporations. These defendants certainly have the financial wherewithal to defend themselves against frivolous ADA claims. Although some defendants may qualify as small businesses, the State has not shown that these defendants cannot reasonably bear the

legal costs of defending themselves. The circumstances, however, support the State's basic allegation that it is in the defendants' economic interest to settle for modest payments to Plaintiff and thereby avoid the substantially greater legal costs required to challenge Plaintiff's standing or the merits of his actions. The fact that 184 cases have already settled or been dismissed and that the average settlement is allegedly in the range of $2,000 supports the State's argument that it is entitled to intervene to protect the public interest which the defendants do not have the economic incentive to protect. The fact that only five defendants in eight cases have filed motions challenging Plaintiff's standing also supports the conclusion that the State's intervention will further a collective resolution of the standing issue and whether the Plaintiff is engaging in abusive litigation conduct. Intervention by the State may also serve to deter other abusive litigation schemes directed at Nevada businesses. The Court therefore concludes that the State of Nevada has established *parens patriae* standing and the right to intervene in this action pursuant to Rule 24(a).

**B.** **Permissive Intervention.**

Rule 24(b)(1) states that on timely motion, the court may permit anyone to intervene who (A) is given a conditional right to intervene by a federal statute; or has a claim or defense that shares with the main action a common question of law or fact. Subsection (b)(2) states that on timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on (A) a statute or executive order administered by the officer or agency, or (B) any regulation, order, requirement or agreement issued or made under the statute or executive order. Subjection (b)(3) states that in exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights. Courts will allow permissive intervention where the intervenor raises a claim that has a questions of law or fact in common with the main case, shows an independent ground for jurisdiction and moves in at timely fashion. *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998); *Garza v. County of Los Angeles*, 918 F.2d 763, 777 (9th Cir. 1990). Even where these elements are satisfied, the court has the discretion to deny intervention if it will unduly delay the proceedings or prejudice the existing parties.

Although the State argues that it should be allowed to intervene to protect its statutory right to pre-suit notice, no such right exists for the reasons previously stated. Permissive intervention by the

State is therefore governed by Rule 24(b)(1), rather than (b)(2).  The independent jurisdictional basis for the State's intervention is its *parens patriae* standing.   For the reasons discussed above, the Court concludes that permitting the State to intervene in this action, and in the other actions filed by Plaintiff Zimmerman that remain pending, is neither untimely or prejudicial to the rights of existing parties.  Therefore, to the extent that the State does not have the right to intervene under Rule 24(a), it will be permitted to intervene pursuant to Rule 24(b)(1).  Accordingly,

**IT IS HEREBY ORDERED** that the State of Nevada's Motion to Intervene as a Limited Purpose Defendant (ECF No. 28) is **granted**.

**IT IS FURTHER ORDERED** that the State of Nevada shall file its proposed answer in intervention within fourteen (14) days of this order, unless an objection to this order is filed by Plaintiff, in which event the State shall file its answer in intervention within fourteen (14) days after the Court overrules an objection to this order.  Upon the filing of its answer in intervention, the State may move for consolidation of this action and the other actions filed by Plaintiff Zimmerman that remain pending in this District.

DATED this 11th day of October, 2017.

GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE